## BURNHAM and Another *v.* BOWEN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF IOWA.

Argued April 10th, 1884.—Decided May 5th, 1884.

### *Railroad.*

Debts contracted by a railroad corporation as part of necessary operating expenses (for fuel, for example), the mortgage interest of the company being in arrear at the time, are privileged debts, entitled to be paid out of current income, if the mortgage trustees take possession or if a receiver is appointed in a foreclosure suit.

If the current income of the road is diverted to the improvement of the prop-

erty by the trustees in possession or by the receiver, and the mortgage is foreclosed without payment of such debts for operating expenses, an order should be made for their payment out of the fund if the property is sold, or if a strict foreclosure is had they should be charged upon income after foreclosure.

An assignee of such a debt has the same rights as the original holder.

When commercial paper is the evidence of such a debt it is no waiver of the privilege to renew the paper at maturity.

It is not intended to decide that the income of a railroad in the hands of a receiver for the benefit of mortgage creditors can be taken away from them and used to pay the general creditors.

The facts are stated in the opinion.

*Mr. John W. Cary* for appellants.

*Mr. James Hagerman* (*Mr. D. B. Henderson* and *Mr. T. B. Daniels* were with him) for appellees.

Mr. CHIEF JUSTICE WAITE delivered the opinion of the court. The facts presented by this appeal are as follows:

On the 1st of June, 1871, the Chicago, Dubuque and Minnesota Railroad Company executed a trust deed, in the nature of a mortgage, conveying all its railroad property and "all the revenues and income" thereof to John A. Burnham, Stephen V. R. Thayer, and James H. Blake, trustees, to secure an issue of bonds amounting in the aggregate to $4,125,000. No interest was paid on these bonds, but the company remained in peaceable possession and operated its road, until the early part of the year 1875, when the trustees commenced a suit for the foreclosure of the mortgage in the Circuit Court of Dubuque County, Iowa, and had a receiver appointed. In the order appointing the receiver no special provision was made for the payment of debts owing for current expenses. The receiver took possession on the 13th of January, and from that time operated the road under the direction of the court.

When the receiver took possession the company was indebted to the Northern Illinois Coal and Iron Company for coal used in running the locomotives. In the agreed facts, upon which the case was heard below, it is stated that the coal was furnished during the year 1874, but the precise time in the year is

not given.  From what does appear, however, we are satisfied that, at the time of the appointment of the receiver, this was one of the current debts for operating expenses made in the ordinary course of a continuing business, to be paid out of current earnings, and that the payment would have been made at the time agreed on if the company had remained in possession. The renewed acceptances, given after the receiver was appointed, indicate that the originals were for different amounts, maturing a month apart, thus implying monthly settlements of monthly accounts, with a somewhat extended credit to meet the business requirements of what may have been, and probably was at the time, an embarrassed railroad company.

On the 5th of January, 1876, E. H. Bowen, who was then the holder of the acceptances, presented a petition to the State Court for the allowance and payment of his claim out of the funds in the receiver's hands.  The claim was allowed, but in connection with the allowance the following entry was made :

" This allowance not intended to allow or establish any lien, but simply to allow them [the acceptances] to be presented and determined as to their rights of payment on final hearing."

After this was done the cause was removed to the Circuit Court of the United States for the District of Iowa, and docketed there on the 11th of January.  The receiver appointed by the State Court continued in possession and operated the road until June 23d, 1876, when another was put in his place.  The net earnings of the road while in the hands of the receivers amounted to more than $25,000.

In 1871 the company purchased lands in Dubuque for its depot and offices, and secured the purchase-money by a mortgage on the property.  This debt being unpaid, a suit for the foreclosure of the mortgage was begun, which resulted in a decree of sale on the 5th of June, 1876, to pay the amount due, being $7,898.  By order of the Circuit Court of the United States this amount was paid from the earnings of the receivership in monthly instalments, beginning on the 5th of June and ending on the 4th of September, 1876.  In addition to this, $14,897.94 was paid on a judgment rendered against the company January 8th, 1875, for the right of way over certain

property in Brownsville. Of this amount, $5,000 was paid June 28th, and the remainder November 1st, 1876. Other judgments for rights of way, amounting in the agregate to $3,020.55, were paid, some in 1875, and others in 1876.

On the 28th of October, 1876, a decree was entered in the suit for the foreclosure of the trust mortgage, finding due upon the bonds $5,980,166, and barring the redemption if payment of this amount was not made in ninety days. It was also further ordered that the trustees have immediate possession of the mortgaged property from the date of the decree and of the *net* income from the commencement of the suit. The decree also contained this provision :

" It is further decreed that this cause, with all the matters in controversy between the plaintiffs and all and any of the defendants and intervenors and claimants, is continued until the next term of this court, and such rights and claims and matters in controversy are in no wise affected or determined by this decree."

Default was made in the payment of the mortgage debt and the property was put into the possession of the trustees by the receivers under the decree of strict foreclosure. Among the property which went into the hands of the trustees under this decree were the depot and offices in Dubuque, which had been relieved of incumbrance by the payments from the income of the receivership, and the several rights of way also paid for from the same fund.

The original petition of intervention filed in the cause by Bowen, the appellee, for the payment of his acceptances for coal, was lost from the files, and on the 18th of October, 1878, on leave of the court, another was substituted in its place, asking that a judgment might be rendered in his favor against the railroad company for the payment of the amount due, " and that such judgment be declared a lien on the property and road of said company in the hands of said trustees and their grantees." On the 30th of October, 1880, a decree was entered finding due Bowen, on his claim, as of that date, the sum of $6,515.42, and declaring that the mortgaged property in the hands of the trustees under the decree of foreclosure was

equitably bound for the payment thereof, " said property having passed to said trustees subject to the rights and equities of said Bowen, intervenor, and said trustees, and all parties holding under them, taking said property subject to such rights and equities on part of said Bowen, intervenor." Provision was then made for a sale of the property if the claim was not paid. From this decree the trustees appealed.

In our opinion the view which the Circuit Court took of this case was the correct one. The company had never paid its bonded interest. From the very beginning it was in default in this particular, yet the mortgage trustees suffered it to keep possession and manage the property. The maintenance of the road and the prosecution of its business were essential to the preservation of the security of the bondholders. The business of every railroad company is necessarily done more or less on credit, all parties understanding that current expenses are to be paid out of current earnings. Consequently it almost always happens that the current income is incumbered to a greater or less extent with current debts made in the prosecution of the business out of which the income is derived.

As was said in *Fosdick* v. *Schall*, 99 U. S. 235, 252, " the income [of a railroad company] out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment, and useful improvements. Every railroad mortgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim on the income." Such being the case, when a court of chancery, in enforcing the rights of mortgage creditors, takes possession of a mortgaged railroad and thus deprives the company of the power of receiving any further earnings, it ought to do what the company would have been bound to do if it had remained in possession, that is to say, pay out of what it receives from earnings all the debts which in equity and good conscience, considering the character of the business, are chargeable upon such earnings. In other words, what may properly be termed the debts of the income should

be paid from the income, before it is applied in any way to the use of the mortgagees. The business of a railroad should be treated by a court of equity under such circumstances as a "going concern," not to be embarrassed by any unnecessary interference with the relations of those who are engaged in or affected by it.

In the present case, as we have seen, the debt of Bowen was for current expenses and payable out of current earnings. It does not appear from anything in the case that there was any other liability on account of current expenses unprovided for when the receiver took possession, and there is nothing whatever to indicate that this debt would not have been paid at maturity from the earnings if the court had not interfered at the instance of the trustees for the protection of the mortgage creditors.

It is said, however, that as no part of the income, before the appointment of the receiver, was used to pay mortgage interest, or to put permanent improvements on the property, or to increase the equipment, there was no such diversion of the funds belonging in equity to the labor and supply creditors as to make it proper to use the income of the receivership to pay them. The debt due Bowen was incurred to keep the road running, and thus preserve the security of the bond creditors. If the trustees had taken possession under the mortgage, they would have been subjected to similar expenses to do what the company, with their consent and approbation, was doing for them. There is nothing to show that the receiver was appointed because of any misappropriation of the earnings by the company. On the contrary, it is probable, from the fact that the large judgment for the right of way was obtained about the same time the receiver was appointed, that the change of possession was effected to avoid anticipated embarrassments from that cause. But, however that may be, there certainly is no complaint of a diversion by the company of the current earnings from the payment of the current expenses. So far as anything appears on the record, the failure of the company to pay the debt to Bowen was due alone to the fact that the expenses of running the road and

preserving the security of the bondholders were greater than the receipts from the business. Under these circumstances, we think the debt was a charge in equity on the continuing income, as well that which came into the hands of the court after the receiver was appointed as that before. When, therefore, the court took the earnings of the receivership and applied them to the payment of the fixed charges on the railroad structures, thus increasing the security of the bondholders at the expense of the labor and supply creditors, there was such a diversion of what is denominated in *Fosdick* v. *Schall* the "current debt fund," as to make it proper to require the mortgagees to pay it back. So far as current expense creditors are concerned, the court should use the income of the receivership in the way the company would have been bound in equity and good conscience to use it if no change in the possession had been made. This rule is in strict accordance with the decision in *Fosdick* v. *Schall*, which we see no reason to modify in any particular.

But it is further insisted that, even though the court did err in using the income of the receivership to pay the fixed prior charges on the mortgaged property, and thus increase the security of the bondholders, there is no power now to order a sale of the property in the hands of the trustees to pay back what has thus been diverted. In *Fosdick* v. *Schall*, p. 254, it was said that if in a decree of foreclosure a sale is ordered to pay the mortgage debt, provision may be made for a restoration from the proceeds of the sale of the fund which has been diverted, and this clearly because, in equity, the diversion created a charge on the property for whose benefit it had been made. Here the parties interested preferred a decree of strict foreclosure, which the court gave, but in giving it saved the rights of all intervenors, and continued the case for the final determination of all such questions. The present appeal is from a decree which grew out of this reservation. As the diversion of the fund created in equity a charge on the property as security for its restoration, it is clear that if the mortgagees prefer to take the property under a decree of strict foreclosure, they take it subject to the charge in favor of the

current debt creditor whose money they have got, and that he can insist on a sale of the property for his benefit if they fail to make the payment without. The agreed facts show that $9,897.94 of the income of the receivership was paid on the judgment for the right of way November 1, 1876, which was after the decree of strict foreclosure was entered.

Lastly, it is claimed that the appellee is barred by his laches, and because he is the assignee of the original creditor. It was decided in *Union Trust Company* v. *Walker*, 107 U. S. 596, that the assignment of a claim of this kind carried with it the right of the original holder to claim payment out of the fund upon which it is charged. When the receiver was appointed the debt was evidenced by business paper maturing at a future date. It was no waiver of any claim on the fund which might come into the hands of the receiver to renew the paper at maturity for the convenience of the holder. It was undoubtedly given originally to enable the coal company to use it as commercial paper if occasion required, and the renewal may have become desirable on account of the use which had been made of it. The original petition of intervention was not filed until January 5th, 1876, but it was before any application of the income of the receivership for the special benefit of the mortgagees, and before the decree of foreclosure was passed, and the rights of the intervenor were saved by that decree. The petition was pending from the time it was filed. The loss of the original petition did not abate the suit. The substitution of the new petition for the old was nothing else in effect than a restoration of the lost paper to the files.

We do not now hold, any more than we did in *Fosdick* v. *Schall*, or *Huidekoper* v. *Locomotive Works*, 99 U. S. 258, 260, that the income of a railroad in the hands of a receiver, for the benefit of mortgage creditors who have a lien upon it under their mortgage, can be taken away from them and used to pay the general creditors of the road. All we then decided, and all we now decide, is, that if current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of the fund which has been thus improperly applied to their use.     *The decree of the Circuit Court is affirmed.*